W. L. MOODY & CO. v. FIRST NATIONAL BANK OF WACO.

Decided June 22, 1898.

1. Bank—Negligence—Identification—Forged Draft.

A bank which cashes for one introduced to it by a reputable person a draft afterwards found to be forgery is not guilty of negligence in failing to make further inquiry for identification of the person presenting the draft.

2. Same—Parties Equally Innocent.

The drawee of a bill professing to be drawn by one of its correspondents who pays the same on presentation can not, on discovering that the signature of the drawer was forged, recover the amount from the bank which had cashed the draft in ignorance of the forgery, and without negligence, for one introduced to it as the payee by a reputable person, and had then indorsed and forwarded it for collection and received the proceeds in due course.

3. Same.

Banks are presumed to be familiar with the signatures of their customers, and must suffer the loss resulting from payment of a forged draft to one who had purchased it innocently and without negligence.

4. Indorsement for Collection—Guaranty of Genuineness.

An indorsement of a draft by one bank to another for collection merely can not be assumed by the grantee to be a guaranty of the genuineness of its correspondent's signature.

5. Evidence—Custom—Banking.

Evidence that it was the custom of banks to rely upon the indorsement of the holder as evidence of the genuineness of the signature of their correspondent appearing as drawer of same is not admissible to excuse want of knowledge of such correspondent's signature.

6. Negligence—Identifying Holder of Draft—Evidence.

Where negligence of a bank, in cashing a draft for one introduced to it as and falsely personating the payee, is asserted, by reason of its failure to make further inquiry as to the identity of such person presenting it, evidence tending to show that further inquiries would have increased instead of destroying its confidence is admissible.

APPEAL from McLennan.   Tried below before Hon. SAM R. SCOTT.

*Eugene Williams,* for appellant.

*Alexander & Atkinson,* for appellee.

FISHER, CHIEF JUSTICE.—This is a suit by the appellants to recover from the appellee $1000 paid by mistake on a draft payable to one C. W. Calhoun, purporting to be signed by Reed Bros., and drawn on W. L. Moody & Co. of Galveston.   Judgment below went against the appellants, from which an appeal is taken to this court.

The facts which support the judgment below, briefly stated, are as follows:  The draft in question was a forgery, in that it was not signed or executed by Reed Bros.   It appeared to be regular on its face, and was made payable to C. W. Calhoun and drawn upon W. L. Moody & Co. The draft was sold by the person purporting to be C. W. Calhoun, but whose real name was afterwards found to be W. L. Smith, to the appellee,

the First National Bank of Waco, which after cashing the draft indorsed it as follows: "For collection for account of First National Bank of Waco," signed by the cashier and forwarded to Ball, Hutchings & Co. of Galveston for presentment to and payment by appellants, which they promptly paid to Ball, Hutchings & Co. Reed Bros. at the time were the regular customers of the appellants, and had on deposit with them about $13,000. The appellants, after paying the draft, charged the amount to Reed Bros., and did not discover that the signature of Reed Bros. was a forgery until several days after they had paid the amount of the draft to Ball, Hutchings & Co. Ball, Hutchings & Co., when the amount was received, forwarded the same to the First National Bank of Waco.

The appellee, when it purchased the draft from Calhoun, supposed that it was genuine, and there was nothing upon its face or nothing said or done at that time to excite its suspicion to the contrary. The cashier of the appellee bank was not personally acquainted with C. W. Calhoun, but he was introduced to the cashier of the bank by Mr. Arnold, a resident citizen of the city of Waco, who, the testimony shows, was a reputable and reliable party.

Arnold at the time was personally acquainted with the cashier and the officials of the appellee bank. Arnold, it seems, had met the party claiming to be Calhoun several days previous to the time he was introduced to the cashier of the appellee bank. He knew nothing personally about Calhoun, except what information he obtained from Calhoun himself.

Calhoun professed to be a merchant who was seeking a business location in Waco, for the purpose of engaging in the mercantile business, and was pretending to purchase property located in Waco, and was then seemingly engaged in the negotiation of trades looking towards the purchase of property. He stated to Arnold that he had sold his stock of goods where he had previously been engaged as a merchant, and had quite a lot of money and wanted to make a deposit in some good reliable bank; that he expected to come to Waco and engage in the grocery business which he had purchased, and asked Arnold if he could introduce him to some bank in the city of Waco in which he could make deposits. Arnold introduced him to Cashier Brown and President Watt, of the Provident National Bank, and subsequently to Cashier John Rose of the First National Bank, at the bank, over the counter of appellee bank. Arnold then stated to the cashier that Calhoun intended to engage in business in Waco and had bought some lots and purchased a grocery business, or was about to do so, and wanted a place for deposits. Rose did not ask Arnold any questions about Calhoun, but accepted the statement made by Arnold as being correct, he at the time being personally acquainted with Arnold, who at the time was regarded as reliable and responsible. Rose had no further knowledge of Calhoun than the information received from Arnold and Calhoun. Calhoun, that day or the day following, presented to Rose the draft in question, which was cashed by the bank and immediately forwarded to Ball, Hutchings & Co. for collection.

The evidence of witness Dutton, who was a merchant engaged in the

grocery business at the time and before the draft in question was paid to Calhoun by the appellee, shows that Calhoun had made a trade with Dutton, agreeing to purchase Dutton's stock of groceries; and the testimony of Baker also shows that Calhoun at that time represented to this witness that he had bought lands from one Mr. Kelley and furnished the witness an abstract to pass on the title to this property. Calhoun at the time stated that he was going into the grocery business in Waco.

There is some evidence which tends to show that the appellee bank was acquainted with the financial standing of Reed Bros., and regarded their draft for $1000 as good. It is clear from the facts in the record that the appellants and the appellee both believed that the signature of Reed Bros. to the draft was genuine, when it was paid by each. There was no suspicious fact or circumstance connected with the purchase of the draft by appellee that would excite inquiry as to the genuineness of the signature of Reed Bros. It really supposed at the time that the party who presented the draft was named Calhoun, and that he was a responsible and reliable party and was the identical holder of the draft. The introduction to the bank of Calhoun by Arnold, a reliable source, was calculated to impress the bank with the belief that they could safely engage in business transactions with Calhoun. This, it appears from the testimony, is the usual means of identification of the party who presents paper for payment; and we can not say that because the bank did not take further steps towards the identification of Calhoun and to the ascertainment of the genuineness of the signature of Reed Bros., that it failed to exercise proper care and diligence in these matters.

It is clear from the testimony that Reed Bros. had been for some time customers of the appellants and that they were familiar with their signature; and while we concede that they paid the draft under the honest belief that the signature was genuine, still, as between them and the appellee, they must suffer the loss. It is presumed that they were familiar with the signature of their customer, and when they paid the forged draft to an innocent party, who, the testimony shows, was not guilty of negligence, they must suffer whatever loss results from that transaction. This principle is well recognized in the case of the Iron City Bank v. Peyton, 39 Southwestern Reporter, 225, and the cases there cited.

There was nothing in the character of the indorsement of the draft by the appellee that would authorize the appellants to assume that the purpose was to guarantee its genuineness. It was not an unqualified indorsement, making the appellee responsible for the amount of the draft; but it was an indorsement to Ball, Hutchings & Co. solely for collection. Therefore, the character of the indorsement could not well be relied upon as leading the appellants to believe that all the transactions concerning the draft were genuine.

There was no error in excluding the evidence of the witness Moody. The custom that existed in Galveston among the banks, as to the credence that was given to the indorsement of paper presented to those banks, could not have the effect to change the legal liability of the appellants.

To permit a bank to say that because of the existence of the local custom to rely upon the indorsement of a draft as satisfactory evidence of the genuineness of the signature of the drawer, and by reason thereof, to absolve it from responsibility in the event it should be a forgery, would relieve it from an application of that principle of law which assumes that a bank is familiar with the signatures of its regular customers and rests upon it the loss that may result from the payment of a forged draft in the name of its customer, when those that present it are not guilty of negligence in receiving it.

There was no error in admitting the testimony of witnesses Baker and Dutton.

It is contended by the appellants that the appellee did not exercise proper diligence to ascertain the identity of Calhoun; and that in cashing the draft under the circumstances, it was guilty of a want of the proper care. The testimony of these witnesses was evidently introduced for the purpose of showing that if the bank had made further inquiries about Calhoun, it would have ascertained facts concerning him tending to increase its confidence in the reliability and responsibility of Calhoun.

We find no error in the record, and the judgment is affirmed.

*Affirmed.*